## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**RICHARD BURT,**

     **Plaintiff,**

**v.**                                                            **Case No.:**

**W. KENT FUCHS, in his official capacity**
**as President of the University of Florida;**
**DAVID E. RICHARDSON, individually;**
**MARY WATT, individually; and**
**SIDNEY DOBRIN, individually,**

     **Defendants.**

_____/

## COMPLAINT

Plaintiff sues Defendants and states:

## JURISDICTION AND VENUE

1.    This action for monetary damages, for declaratory and injunctive relief, and for other equitable and ancillary relief is brought under the First and Fourteenth Amendments to the Constitution of the United States, as enforced through 42 U.S.C. §§ 1983 and 1988.

2.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiffs' claim arises under the laws of the United States.

3.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because the main campus of the University of Florida is in Gainesville, Alachua County, Florida.

4.      This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201–2202.

5.      Plaintiff Richard Burt ("Plaintiff" or "Burt") is a citizen of the United States and a citizen and resident of the State of Florida and has so resided at all times material hereto.

6.      Defendant W. Kent Fuchs, in his official capacity, is sued as agent of the University of Florida (UF), Board of Trustees. He is President of UF.  He is sued for equitable relief only, not for damages.  His principal office is in Gainesville, Alachua County, Florida.

7.      Defendant David E. Richardson is the Dean of the College of Liberal Arts and Sciences at UF (CLAS).  He is sued individually for damages. His principal office is in Gainesville, Alachua County, Florida.

8.      Defendant Mary Watt is an Associate Dean of the College of Liberal Arts and Sciences at UF (CLAS).  She is sued individually for damages. Her principal office is in Gainesville, Alachua County, Florida.

9.      Defendant Sidney Dobrin is the chair of the Department of English at UF.  He is sued individually for damages.  His principal office is in Gainesville,

2

Alachua County, Florida.

10.     Substantially all the transactions and occurrences herein occurred in Alachua County, Florida.

## CONDITIONS PRECEDENT

11.     All conditions precedent to bringing this action have occurred or been fulfilled.

## INTRODUCTORY OVERVIEW

12.     This case arises in a milieu of threats to academic freedom in Florida universities as well as K-12 schools not seen since the days of the Johns Committee of 1956-1965.  This has involved such issues as teaching Critical Race Theory (CRT); discussing issues involving lesbian, gay, bisexual, and transexual (LGBT) concerns; faculty participation as expert witnesses on voting rights in a case against state government; and public health issues surrounding institutional responses to and handling of Covid-19.

13.     This case falls into the latter category.   An almost unbelievable sequence of events of official misconduct led to violations of Plaintiff's civil rights and caused him damage because he exercised his rights of free speech to protect himself and others against the Covid pandemic.

14.     Florida Governor Ron DeSantis has expressed a point of view regarding Covid-19 that he generally describes as "freedom."  This means a general opposition

to lockdowns, remote working and class attendance, a vigorous opposition to mandatory masking, and limitations on testing and social distancing.

15.     These views are shared by the Chair of UF's Board of Trustees, Morteza "Mori" Hosseini.  Hosseini drew criticism for his instrumentality in the nomination by DeSantis of Dr. Joseph Ladapo for Florida Surgeon General and Secretary of Health and for the hiring of Dr. Ladapo to a sinecure at the UF medical school.  Dr. Ladapo is regarded by most medical professionals as having unorthodox and controversial views of Covid-19 and is regarded by many as a quack who attained his positions in Florida solely because of the alignment of his views with those of DeSantis.

16.     Though it is improper for individual trustees to meddle in university governance, Hosseini took on a role of communicating DeSantis' preferences about university administration to President Fuchs and others.  The state universities are, by law, free from political meddling, but such laws have not been observed under DeSantis.

17.     Hosseini's construction company contributed $112,000 to DeSantis' campaign for governor.  The governor's wife also used Hosseini's private jet to fly to a fundraiser in 2019.  Other board members also contributed to DeSantis' campaign: Jim Heavener donated $250,000 while Rahul Patel gave $175,000 and Anita Zucker $100,000.

18.     A media storm broke over the decision of the Dean of Liberal Arts & Sciences, David Richardson (a Defendant in this case), to deny permission for three professors to testify against the state in a voting rights case.   Richardson later admitted to the media that his decision was heavily influenced by the university's top administrators.

19.     A firestorm of criticism from many sources forced the university to backpedal as President Fuchs ordered Richardson to reverse the decision.  The three professors filed suit.  UF suffered a loss of prestige and even a prospect of losing academic accreditation.   The sequence of events even caused the resignation of President Fuchs who remains in office pending selection of a successor.

20.     The political meddling extended into UF's Covid response.  As the Fall Semester of 2021 approached, certain departments, including those in CLAS, such as English, planned to schedule classes remotely by ZOOM for at least the first three weeks of the semester.

21.     Fuchs sent Hosseini a draft email Fuchs planned to send out to the entire university community making all classes face-to-face with no remote options. Fuchs offered to let Hosseini make changes. Hosseini reported to Fuchs that the governor's office had received it.  Fuchs followed up with his campus-wide email saying there would be no online classes, even temporarily.

22.     DeSantis, who has made resistance to online classes and mask and

vaccine mandates part of his political image, was pushing hard at the time to keep public schools and businesses in Florida open. The state's flagship university moving classes online, even temporarily, would have seemed defiant and disrespectful to gubernatorial policy.

23.    Hosseini was particularly strident in his disapproval of professors teaching by ZOOM.  He fumed in one statement, "This behavior is unacceptable. It is disrespectful not only to the taxpayers of Florida, whose hard-earned dollars pay faculty salaries, but it is also disrespectful to these faculty members' hard-working colleagues," he said. "It is disrespectful to the students who depend on their professors' full attention and commitment. This will not stand. It must stop, and it will stop."  These remarks were apparently directed at some remote teaching at UF in the Spring semester of 2021.

24.    Fuchs made no effort to conceal his obeisance to DeSantis.  In an address to the Faculty Senate on September 23, 2021, Fuchs warned that criticism of the State of Florida's COVID-19 response would "fracture the relationship between the university and the state government ... ultimately leading to a diminished or inability to impact future policies or decisions affecting the university."  In other words, if the university did not self-censor, it would be censored from outside or starved.

25.    Plaintiff Richard Burt wandered unknowingly into the vortex of this

controversy.

## GENERAL ALLEGATIONS

26.    Plaintiff is a tenured full professor of English at the University of Florida (UF), and has been so employed since July, 2003.

27.    On or about August 9, 2021, Plaintiff learned from an administrative memo that faculty who desired to teach remotely could do so for the first three weeks of the Fall 2021 semester.

28.    Faculty in the English Department who wished to teach remotely were instructed to notify their chair and to post the remote teaching on the class "Canvas" homepage.  Plaintiff did so for his two classes.

29.    Plaintiff was especially concerned about the return to personal contact because he was vulnerable to a Covid infection because of several surgeries, being 67 years old and suffering various infirmities of age, and having thus far been able to secure only two of the three vaccinations.

30.    However, Fuchs sent out the memo referenced above, on August 13, 2021, stating that remote teaching was no longer an option for the Fall 2021 semester.

31.    Dobrin sent out an email to the English Department on August 16, 2021, referencing the order from Fuchs and scheduling a department meeting by ZOOM for August 18, 2021.

32.    Plaintiff was not able to attend the meeting.   Attendance was not mandatory.

33.    It is not clear what happened at the meeting.   In an "Investigative Report," issued later by UF and described more fully below, UF investigator Petra Pindar reported that in the August 18, 2021, meeting, Dobrin "affirmed that remote teaching was no longer an option for faculty and that they should plan to move forward with face-to-face instruction."

34.    Dobrin himself, however, has a somewhat different story.

35.    In an email dated August 19, 2021, directed to all English faculty and some other affected persons, Dobrin apologized for not being able to provide minutes of the previous day's meeting because, "The ground is shifting too often for me to convey policies in writing and be comfortable that those policies will remain constant."

36.    Dobrin went on to say, "I recognize that this is frustrating and that it makes planning for classes on Monday more than complicated."

37.    This important development somehow escaped the investigator's scrutiny, as well as the attention of Richardson, Fuchs, Watt, and, later, even Dobrin himself.

38.    Amidst the confusion, Plaintiff responded on August 18, 2021, to Dobrin's email offering a remote option back on August 16, 2021, stating, "I will be

providing a remote option."  Plaintiff thought this meant a ZOOM option, as would any reasonable person reading the sequence of correspondence.  But apparently, Dobrin meant something else by "remote option."  UF continued in its Report on this matter and otherwise, to this day, to use the term "remote option" to denote teaching by ZOOM or some similar remote-access program.  E.g., see the reference at Page 3, Paragraph 6 of the Report, to President Fuchs "rescinding the remote option."

39.    Dobrin responded to Plaintiff's statement that he would be providing a remote option with an email on August 19, 2021, saying simply "Thanks [wink emolji]."  This was six days after the Fuchs memo, banning remote teaching.

40.    Dobrin followed up with an email to the English faculty on August 22, 2021, saying, "Please remember that if you plan to provide a remote option for your students, you need to notify me and need to be sure that the option is identified on your syllabus and Canvas page by the end of the day tomorrow (Monday, August 22)."

41.    Accordingly, On August 23, 2021, Plaintiff notified the students in his classes that they would be meeting remotely so they should not show up at the classroom.  He attached to the email a statement from the president of the faculty union at UF, Paul Ortiz, criticizing UF's poor compliance with CDC guidelines on Covid and urging certain specific improvements.

42.     On that same day, a student enrolled in one of Plaintiff's classes dropped the class in response to Plaintiff's email and sent an email of complaint to the university's ombudsman, who forwarded it to Richardson, who, in turn, forwarded it to Dobrin for action.

43.     The student email stated that Plaintiff had announced an intention not to meet the class in person, contrary to university rules, and had posted a message from what the student called "a Covid 19 UF protest group."   The latter was an apparent reference to the Paul Ortiz statement on behalf of the United Faculty of Florida.

44.     Dobrin "reminded" Plaintiff that UF policy is "clear" that all classes were in person, and asked if the report were accurate.

45.     Plaintiff responded on the same day, confirming "more or less" the accuracy of the student email, asking if he misunderstood the remote option, whether he had to wear a mask, whether a mask would be made available, whether there would be seating arrangements, what to do about hearing problems between professor and students without a microphone, and whether to send a corrective email stating class would meet face-to-face.

46.     Still on August 23, 2021, Plaintiff sent Dobrin for approval a copy of the email he proposed to send to his students stating that the class would be face-to-face, not remote.

47.     The Investigative Report and later disciplinary documents quote Dobrin as claiming that he told Plaintiff not to do anything else and that Plaintiff's failure to comply with that directive is the basis of the insubordination charge later leveled against Plaintiff.  Plaintiff never received such a directive.  Dobrin's three emails in the relevant time frame say no such thing.  There is a clear record that in that same time frame, Dobrin assiduously resisted all Plaintiff's efforts to speak with him by phone or in person.  There is conclusive proof that Dobrin never uttered any such instruction, orally or in writing.   Indeed, Plaintiff sent an advance copy of his proposed email to the students to Dobrin for approval and got no response.

48.     Hearing nothing from Dobrin or any other administrator, Plaintiff sent the email to his classes, on August 23, 2021, stating that he had been ordered, by his Chair, against his will, to teach his classes face-to-face (hereinafter F2F).  The email then stated, "You may stop reading here. If you want to learn what happened, you may keep reading. YOU ARE NOT REQUIRED TO KEEP READING. YOU MAY STOP HERE."  There followed a reproduction of the email exchanges between Plaintiff and Dobrin.

49.     The next morning, August 24, 2021, Plaintiff was in his office, ready to teach. About 15 minutes before class, Dobrin emailed Plaintiff, saying, "Please cancel your classes for today.  We will need to address this situation before you meet your students again."

50.     Assuming the cancellation was for one day, being unable to reach Dobrin, and concerned that the students would blame him for not showing up to class, Plaintiff wrote another email, on August 24, 2021, apologizing for the cancellation, describing his commitment to the class and mentioning the four months he had spent preparing for it, Plaintiff told the students to complete the class assignment for the next day.

51.     Plaintiff wrote to Dobrin the same day, offering to add or retract any language Dobrin wanted added or retracted.  There was no response.

52.     Dobrin wrote Plaintiff the next day, August 25, 2021, stating, "starting tomorrow your assigned courses will be taught by someone else. Accordingly, you should not attend those classes."

53.     A few days later, on August 30, 2021, an associate dean of CLAS, Mary Watt, sent a letter to Plaintiff, placing him on involuntary administrative leave with pay, pending investigation.  The Watt letter also barred Plaintiff from setting foot on campus without explicit direction and from engaging in any activity that involved any aspect of his job, or from communicating with any member of the university community.

54.     On that same day, Watt sent another letter to Plaintiff requiring him to submit to a mental exam and to authorize release of the results of that mental exam to the University.  Plaintiff signed all the authorizing documents and submitted to

the exam, all under the impression that refusal would cause loss of his job.

55.     Neither Associate Dean Watt nor any other UF official had any basis for questioning Plaintiff's mental health other than his disagreement with the dogma of the DeSantis regime on protection against Covid.  This political abuse of the mental health system to persecute and discredit political opponents is recognized as a feature of autocratic regimes and is the subject of a substantial body of professional literature. It is also a violation of Plaintiff's constitutional rights.

56.     The "investigation," referenced in the Watt letter and mentioned at various points above, arose from action by Watt's immediate superior, Defendant Richardson.  On August 24, 2021, just one day after Plaintiff's letter cancelling class, Richardson wrote UF's Human Resources unit requesting an investigation of Plaintiff.   Richardson requested, specifically, that the investigation determine whether Plaintiff had violated University of Florida Regulation 1.008, describing behavior that is disruptive and, as such, prohibited.   More particular was Richardson's concern that Plaintiff violated University standards by sending "provocative" emails to students that "had the potential to cause controversy."  This became "Count I" of the charges against Plaintiff to be investigated.

57.     Investigator Petra Pindar performed the investigation.

58.     Plaintiff received notice of the investigation in the form of a letter of August 30, 2021, from Assistant Vice President for Human Resources Brook

Mercier.  The investigation was denominated as a Management Directed Inquiry (MDI).  Mercier identified Defendant Richardson as the person requesting the investigation.  The investigation was meant to include, but not be limited to "disruptive behavior."

59.    At the time Investigator Pindar interviewed Plaintiff, the Regulation 1.008 issue of "disruptive behavior" was the only count of the complaint.  However, after Plaintiff had his input, Pindar, on her own initiative or not, added two more counts without notice to Plaintiff and without opportunity for him to have further input on the new charges before issuance of the report and the determinations on the three counts.  Plaintiff had been alerted to the possibility that the investigation might expand, but was not notified that it might expand with no due process for him to challenge the additional charges before determination of the outcome.

60.    Count II alleges violation of UF Regulation 7.048, "faculty misconduct," and Count III alleges violation of Collective Bargaining Agreement (CBA) Article 10.3 (b), describing academic responsibility of faculty to treat students, staff, and colleagues civilly.

61.    All three counts are so vague and amorphous that guilt or innocence can be easily manipulated to the desired outcome of the investigator.

62.    The investigator found all three charges to be substantiated.

63.    It is important to consider the context in which a matter of such

14

prodigious triviality could threaten the employment of such a distinguished and tenured professor.

64.     When Plaintiff finally got to talk with Dobrin on August 31, 2021, Dobrin told Plaintiff that he had discussed the matter with three associate deans and come away with the impression that the university had no intention of firing Plaintiff, but needed to make a show of taking action because the parents of the student who had complained of Plaintiff's email were influential political contributors and university donors who had gone directly to Richardson and who needed to be appeased.  Dobrin said something about ZOOM teaching in Spring 2021 at the UF English Department had made its way to Tallahassee and, "We are being watched. There is a black mark next to my name in Tallahassee."  Dobrin added that faculty are not allowed to talk about Covid in the classroom.

65.     This was all occurring in the midst of the shenanigans involving Hosseini, DeSantis, and Fuchs as described earlier *supra*.  Plaintiff, in an exercise of his basic First Amendment rights, had simply stumbled into a political hornet's nest in which UF administrators had to punish anything that looked like a challenge to the DeSantis regime on Covid.  Hence, the bogus "investigation."

66.     Rule 1.008 has a list of highly specific prohibited conduct, including such things as violence, drug abuse on campus, alcohol-related misconduct, theft, sexual harassment, etc.  There is one more general, catch-all sort of category and,

though Pindar's report does not explicitly cite that provision, it must be the only basis for the substantiation of the charge. That is, "Actions which impair, interfere with or obstruct, or aid and abet, or initiate the impairment, interference with or obstruction of the orderly conduct, processes and functions of the University."

67.    The specific conduct alleged to be in violation of the rule involves the emails to students, failure to attend the department meeting, and not following the directives of his superiors.

68.    The Report assumed that Plaintiff's emails to the students "incited concern and worry among the students," as though they were fragile, hothouse flowers in an asylum instead of a university.

69.    The Report also traduces Plaintiff for forwarding Dobrin's public record email as an attachment. There is no rule anywhere barring this practice, which is also Dobrin's own routine custom. Plaintiff was singled out for discriminatory punishment for a widespread (and perfectly legal) practice at UF.

70.    The Report charges Plaintiff with dishonesty in claiming to have had a good faith belief that a remote option was still available at the time he sent his first email to the classes. But the Report carefully avoids any discussion of Dobrin's own confusion on the matter when he declined to reduce the department meeting minutes to writing because the remote-teaching situation was changing back and forth so quickly. Nor is there any discussion of Dobrin's ambiguous correspondence

approving the "remote option" in those same days.

71.     Nowhere does the Report cite a shred of evidence that attendance at any particular English Department meeting is or has ever been mandatory or that any other professor has ever been even admonished for non-attendance.  Nor was Plaintiff or anyone else "directed" to attend that particular meeting. Even so, the Report cites Plaintiff's missing that meeting as "insubordination" and forfeiture of an opportunity to get clarity on UF policy, even though the meeting was so inconclusive that the Chair would not reduce the minutes to writing.

72.     The alleged violations of Regulation 7.048 make up the finding on Count II, faculty misconduct.   Here, the Report double-counts missing the department meeting as violation of still another rule, claiming Plaintiff "opted to miss the meeting even though the entire department was required to attend."  There is no source for that allegation of mandatory attendance.  Nothing in writing, no statement attributed to any witness, nothing.  The allegation is a complete fabrication by the Report's author.

73.     The second fabrication is that Plaintiff was directed "not to do anything" before he emailed his students.  This is at least attributed to Dobrin, so it is not completely unsourced.  But as shown above, there is no possibility that the allegation is true, which is something the investigator would have seen in the normal exercise of any due diligence at all.  All of Dobrin's written communications are in

the record as is Plaintiff's attempt to clear his emails to the students with Dobrin in advance of sending them.  So too are Plaintiff's repeated attempts to secure a phone call or meeting with Dobrin.   This claim of insubordination is so flagrantly mendacious as to shock the conscience.

74.    Plaintiff had been previously admonished for using a light-hearted title in his signature block, "Herr Doktor Rev. Professor Blind Burt Ph.4KUltaHD, Department of loser Studies, Pharmakonology, and Cosmic Criticism." He used that title again and the Report, with a straight face, cites that as an example of faculty misconduct and insubordination worthy of discipline.   Notably, no particular language of Rule 7.048 is cited in support of Plaintiff's alleged violation of that rule.

75.    Count III concerns a "lack of civility."  This section of the Report relies on CBA Article 10.3(b). The Report cites, as proof of this incivility, the author's perception that Plaintiff's emails to the students "could be perceived as adversarial and argumentative."  Further, according to the Report, Plaintiff decided to share his thoughts "from a place of aggravation and anger at not being able to teach remotely." For these reasons, the investigator found Plaintiff guilty of Count III, as well.

76.    It is no small irony that Appendix 5 of the Report is a reproduction of Article 10 of the Collective Bargaining Agreement (CBA) which concerns "Academic Freedom and Responsibility," and which is fully binding legally, and which makes the discipline imposed completely unlawful.

18

77.    In at least two places, Article 10 specifically addresses freedom of faculty to do what Plaintiff did.  The general language of Article 10.2 guarantees the right of faculty "**to speak freely on all matters of university governance**, and to speak, write, or act in an atmosphere of freedom and confidence."  (Emphasis added.)  Further, at Article 10.2(b), the CBA states, "Faculty members shall have freedom to present and discuss, frankly and forthrightly, academic subjects and policy, **university governance, or other matters pertaining to the health of the University**." (Emphasis added.)

78.    The claim that Plaintiff's discussions of university governance were lacking in civility is fatuous and contrived.  Plaintiff used no profanity, called no names, attacked nobody's character, made no inflammatory characterizations, and did nothing else one associates with incivility. The offending comment cited by UF is that statement that Plaintiff was being forced to teach face-to-face against his will because he wanted to teach remotely.  That was a perfectly true statement that insults nobody and is a fair expression of disagreement on a matter of university governance that is of the highest public interest because it deals with the worst disease outbreak in the nation's history and directly concerns the health, safety, and welfare of the entire campus community, including those directly addressed.

79.    There was no insubordination.  There was never a directive to attend a department meeting and there was never an instruction to do nothing until further

notice.  Other than the triviality of the signature block, the other two examples are arrant fabrications.

80.     For the whole of Fall Semester, Plaintiff was barred from setting foot anywhere on campus.  He could not use the library, attend an athletic or cultural event, have access to his office, or even enjoy a walk across campus.  He was treated as a criminal.  He was stripped of his teaching assignments. He was forbidden from communication with students or employees of the university, even to the extent he needed such communications to defend himself against the sham charges the university continued to make against him. He was subjected to a Soviet-style involuntary mental examination for his dissent.  These were some of the penalties imposed on Plaintiff for expressing a viewpoint different from that of the DeSantis regime on Covid.

81.     In response to the sham Investigative Report issue on November 8, 2021, Defendants Richardson and Dobrin co-signed a letter of January 19, 2022, notifying Plaintiff of his suspension without pay for five days for "misconduct."  The letter claimed that Plaintiff's emails to students were "improper and unprofessional in content and form."   The letter repeats the false statement that Plaintiff was instructed "not to do anything," though one of the authors of the letter knew full well that he had never given any such instruction.  The letter cited the statement, "I have been ordered, against my will, by my Chair to teach F2F," as "provocative and

adversarial."  The letter cited attaching Dobrin's email to Plaintiff's email to students and the signature block issue as the final reasons for the adverse action.

82.     In addition to the five-day suspension, the letter imposed four additional requirements: comply with all university rules and all directions of the Chair, Dean and university leadership; make all student-related email communications professional and applicable to the immediate discussion; use the correct signature block; and take courses in email effectiveness and cultivating judgment.

83.     These four latter requirements are intended to be over and above those governing other faculty at UF and are intended to be permanent.  The letter states that any future violations will result in the termination of Plaintiff's employment as a tenured professor. The letter obviously set up Plaintiff to be fired on some pretext.

84.     The foregoing shows how easily the University can fabricate instances of "insubordination" and make violations of speech that may cause "controversy" or that incites "concern and worry" among readers.  Dobrin went so far as to reprehend a characteristic of Plaintiff that causes him to "do what he wants to do until he is met with resistance."  That is a trait Plaintiff shares with every other person on Planet Earth, but is still an attribute the University plans to use in evaluating whether a future "offense" warrants firing of this tenured professor.  The practical consequence is that a tenured professor has been placed on a form of permanent probation under which the slightest real or contrived offense can cause his firing.

85.    The University was under binding obligations to protect Plaintiff's exercise of his First Amendment rights at all the times it was, instead, violating them.

86.    The CBA anticipated the likes of DeSantis by providing, "The University recognizes that internal and external forces may seek at times to restrict academic freedom, and the University shall maintain, encourage, protect and promote academic freedom."  Instead, the University folded in the face of political intimidation.

87.    The CBA states, "The University shall not apply any provision in this Agreement to violate a faculty member's academic freedom or constitutional rights, nor shall a faculty member be punished for exercising such freedom or rights, either in the performance of University duties or activities outside the University." Yet, Count III of the Report performs a gymnastic and disingenuous reading of the CBA to charge Plaintiff with "incivility."

88.    Numerous other provisions of the CBA not only affirm the academic and social freedom of faculty to speak as Plaintiff did, but place an affirmative responsibility on the university administration actively to preserve and protect that freedom, not just to tolerate or suffer it.

89.    The course of Defendant's conduct leading up to and culminating in the suspension letter evinces a motive to deprive Plaintiff of his liberty and property for his exercise of his First Amendment rights as well as his rights under UF's own

collective bargaining agreement.

90.    The violation by Defendants of the university's own policies, rules, and procedures, is evidence of a motive to violate Plaintiff's constitutional rights and evidence of the pretextual nature of the excuses offered by Defendants for those violations.

91.    Plaintiff has had to retain counsel to vindicate his rights in this matter and owes a reasonable attorney's fee.

## COUNT I – 42 U.S.C. § 1983
## FIRST AND FOURTEENTH AMENDMENT
### Equitable Relief Only – Against FUCHS

92.    Plaintiff reasserts Paragraphs 1-91.

93.    The foregoing facts establish a basis for an order from this court enjoining the proposed five-day suspension and barring enforcement of any and all penalties and vulnerabilities imposed upon by Plaintiff by UF for his speech in the events described above. Fuchs and his successors should be compelled to place Plaintiff in the position he would be in if no adverse actions were ever taken for his speech or expressive conduct as described above.

94.    The craven acquiescence of Fuchs in the matter of the expert witness case and in the remote-teaching matter set a tone of capitulation rather than resistance  to the "barbarians at the gate" that filtered down the administrative ranks to the likes of Richardson, Watt, and Dobrin.  This was especially true concerning

23

speech on Covid that deviated in any way from the quack orthodoxy of DeSantis.

95.    Any such heresy was subjected to meticulous scrutiny.   Indeed, on information and belief, Fuchs was in personal communication with Richardson on how to deal with Plaintiff, just as Fuchs was directing Richardson on the expert witness matter. Making an example of Plaintiff was part of striking fear into the hearts of other faculty.

96.    Defendant Fuchs, in his official capacity, is a "person" within the meaning of § 1983.

97.    The acts of Defendant Fuchs as described herein were taken under color of state law, custom, or usage.

98.    The acts of Defendant Fuchs as described herein were purposeful and arise from an official policy or custom.

99.    The acts described herein are all attributable to Defendant Fuchs as President of UF.  All such acts as described herein were taken under color of state law, custom, or usage.

100.   The acts of Defendant Fuchs (all the acts of university officials described herein were, constructively, acts of Fuchs in his official capacity) as described herein were purposeful and arise from an official policy or custom.

101.   The Fourteenth Amendment of the United States Constitution guarantees that no state shall deprive any person of liberty without due process of

law.  The First Amendment of the United States Constitution, applicable to the states under the Fourteenth Amendment, guarantees the right of freedom of speech -- a right which stands at the very apex of constitutional protection when exercised, as here, in political speech aimed at protesting the restrictive conduct of government on matters of the most grave public concern.

102.   The Fourteenth Amendment of the United States Constitution guarantees that no state shall deprive any person of property without due process of law.  The proposed suspension of Plaintiff without pay for five days deprives Plaintiff of his property without due process of law, especially inasmuch as that determination arose from the findings of a kangaroo court proceeding that fabricated a factual record and ignored the strictures that governed the proceeding.  The same holds true for the violation of Plaintiff's rights by placing him on a sort of permanent probation under which the slightest real or contrived offense is a ground for his firing.

103.   Plaintiff is entitled to equitable and ancillary relief to remedy the violations described above.

### COUNT II – 42 U.S.C. § 1983
### FIRST AND FOURTEENTH AMENDMENT
### Damages – Against RICHARDSON

104.   Plaintiff reasserts Paragraphs 1-91.

105.   Defendant Richardson is a "person" within the meaning of § 1983.

106.   The acts of Defendant Richardson as described herein were taken under color of state law, custom, or usage.

107.   The acts of Defendant Richardson as described herein were purposeful and arise from an official policy or custom.

108.   The conduct of Defendant Richardson in initiating a Management Direct Inquiry (MDI) against Plaintiff on the most bogus of pretexts; in directing Watt to place Plaintiff on administrative leave, to bar him from campus for a whole semester, and to prohibit him from communication with any UF students or employees (even those whom he might need for his defense); in directing Watt to subject Plaintiff to an involuntary mental exam; in refusing to resist the improper and unconstitutional pressures from higher officials to suppress speech on Covid; and in authoring the suspension letter depriving Plaintiff of five days' pay and setting him up for easy termination by creating a special vulnerable status for him in retaliation for his exercise of First Amendment rights – all these actions violate Plaintiff's rights under the First and Fourteenth Amendments.

109.   The acts of Richardson as described herein were willful, wanton, and taken with malice.

110.   Plaintiff has suffered damages including suppression of his free speech, professional embarrassment, humiliation, garden-variety emotional distress, and loss of enjoyment of life as a result of the conduct of Richardson described above.

26

**COUNT III – 42 U.S.C. § 1983**
**FIRST AND FOURTEENTH AMENDMENT**
**Damages – Against WATT**

111.   Plaintiff reasserts Paragraphs 1-91.

112.   Defendant Watt is a "person" within the meaning of § 1983.

113.   The acts of Defendant Watt as described herein were taken under color of state law, custom, or usage.

114.   The acts of Defendant Watt as described herein were purposeful and arise from an official policy or custom.

115.   The conduct of Defendant Watt in placing Plaintiff on administrative leave; in barring him from campus for a whole semester, in prohibiting him from communication with any UF students or employees (even those whom he might need for his defense); and in compelling him to submit to an involuntary mental exam – all these actions deprived Plaintiff of his First and Fourteenth Amendment rights.

116.   The acts of Watt as described herein were willful, wanton, and taken with malice.

117.   Plaintiff has suffered damages including suppression of his free speech, professional embarrassment, humiliation, garden-variety emotional distress, and loss of enjoyment of life as a result of the conduct of Watt described above.

## COUNT IV – 42 U.S.C. § 1983
## FIRST AND FOURTEENTH AMENDMENT
### Damages – Against DOBRIN

118.   Plaintiff reasserts Paragraphs 1-91

119.   Defendant Dobrin is a "person" within the meaning of § 1983.

120.   The acts of Defendant Dobrin as described herein were taken under color of state law, custom, or usage.

121.   The acts of Defendant Dobrin as described herein were purposeful and arise from an official policy or custom.

122.   The conduct of Defendant Dobrin punishing exercise of Plaintiff's First Amendment rights by stripping him of his fall semester teaching and by joining with Richardson in suspending Plaintiff for five days and setting him up for easy termination by creating a special vulnerable status for him in retaliation for his exercise of First Amendment rights – all these actions violate Plaintiff's rights under the First and Fourteenth Amendments.

123.   The acts of Dobrin as described herein were willful, wanton, and taken with malice.

124.   Plaintiff has suffered damages including suppression of his free speech, professional embarrassment, humiliation, garden-variety emotional distress, and loss of enjoyment of life as a result of the conduct of Dobrin described above.

28

## PRAYER OF RELIEF

WHEREFORE, Plaintiff prays for the following relief:

a)      that process issue and this Court take jurisdiction over this case;

b)      judgement against the individual Defendants and for Plaintiff awarding compensatory and punitive damages on all Counts for the individual Defendant's violations of law enumerated herein;

c)      judgement against Defendant Fuchs and for Plaintiff permanently enjoining Fuchs and his successors from future violations of law enumerated herein and equitable relief for the Plaintiff, remedying all benefits of which Plaintiff has been unlawfully deprived and restoring his status in every respect to what it would be had the adverse actions never occurred;

d)      prejudgment interest;

e)      judgement against Defendants and for Plaintiff awarding Plaintiff his attorney's fees and costs;

f)      all equitable relief that is allowed by law;

g)      such other and further relief as is appropriate.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Filed this 29th day of March, 2022.

Respectfully submitted,

*/s/Richard E. Johnson*
Richard E. Johnson, Bar No 858323
LAW OFFICE OF RICHARD E. JOHNSON
rick@rej-law.com
314 West Jefferson Street
Tallahassee, Florida 32301
Telephone: (850) 425-1997
Facsimile: (850) 561-0836